IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TRUDI SHOUSE,<br><br>        **Plaintiff,**<br><br>v.<br><br>**CATHOLIC CHARITIES OF NORTHEAST KANSAS, INC.,**<br><br>        **Defendant.** | Case No. 20-2462 |

## COMPLAINT

Plaintiff Trudi Shouse ("Plaintiff"), for her Complaint against Defendant Catholic Charities of Northeast Kansas, Inc. ("Catholic Charities"), states and alleges as follows:

### Nature of Action

1. Plaintiff worked for Catholic Charities as Clinical Director of the organization's Catholic Community Hospice program. Because Catholic Community Hospice provides hospice services for Medicare beneficiaries, the program and its staff must operate and furnish those services in compliance with all applicable federal, state and local laws and regulations related to the health and safety of patients.

2. Shortly after her employment began, Plaintiff discovered and reported numerous illegal enticements and billing practices used by Catholic Community Hospice that violated federal healthcare laws, defrauded the healthcare system, and undermined patients' rights. After reporting this illegal conduct, Plaintiff was immediately subjected to a series of escalating and unwarranted adverse employment actions. This pattern of retaliation culminated in the termination of her employment on October 10, 2019.

3. Plaintiff's termination was unjustified and only occurred because she discovered and reported unlawful activities within Catholic Community Hospice. Plaintiff brings this action for unlawful retaliation under the False Claims Act, 31 U.S.C. § 3730(h). Plaintiff seeks remedies including double back pay, special damages, litigation costs and attorneys' fees.

## Parties

4. Plaintiff is an individual and a resident of Leavenworth County, Kansas.

5. Catholic Charities is a non-profit corporation formed under Kansas law and headquartered in Overland Park, Kansas.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claim in this case arises under the laws of the United States.

7. This Court has general personal jurisdiction over Catholic Charities because it is headquartered in the State of Kansas, is subject to service of process in the State of Kansas, and has affiliations with the State of Kansas that are so continuous and systematic as to render it essentially at home in this State. This Court has specific personal jurisdiction over Catholic Charities because the claim against it arises out of its acts in the State of Kansas that were purposefully directed at a resident of this State, including the commission of tortious acts.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim against Catholic Charities occurred in this judicial district.

**General Allegations**

9. Catholic Charities describes itself as "[a] ministry of the Archdiocese of Kansas City in Kansas," which was "[f]ounded by the Roman Catholic Church to meet the needs of the most vulnerable in our communities."

10. The "most vulnerable" in our communities include patients in hospice who receive end-of-life care through Catholic Charities' Catholic Community Hospice program.

11. Unfortunately, these "most vulnerable" individuals are at great risk of falling victim to fraud and abuse in arrangements for services between hospice providers and skilled nursing facilities. The U.S. Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") explains:

> Hospice services may be appropriate and beneficial to terminally ill nursing home residents who wish to receive palliative care. However, arrangements between nursing homes and hospices are vulnerable to fraud and abuse because nursing home operators have control over the specific hospice or hospices they will permit to provide hospice services to their residents. An exclusive or semi-exclusive arrangement with a nursing home to provide hospice services to its residents may have substantial monetary value to a hospice. In these circumstances, some nursing home operators and/or hospices may request or offer illegal remuneration to influence a nursing home's decision to do business with a particular hospice. . . .
>
> Because kickbacks can distort medical decision making, result in overutilization, and have an adverse effect on the quality of care patients receive, they are prohibited under the Federal health care programs, including Medicare and Medicaid. Under the anti-kickback statute, it is illegal to knowingly and willfully solicit, receive, offer, or pay anything of value to induce referrals of items or services payable by a Federal health care program.

HHS OIG, *Fraud and Abuse in Nursing Home Arrangements with Hospices*, at 3 (March 1998), available at: https://oig.hhs.gov/fraud/docs/alertsandbulletins/hospice.pdf.

12. In addition to illegal kickback schemes, hospice services are also susceptible to fraud and improper billing practices:

> The most widespread type of hospice-related fraud or improper billing is providers wrongfully admitting patients who are ineligible for care, according to the attorneys. . . . Closely related to improperly admitting patients is improperly retaining patients when they are clearly not actively dying, though hospice rules do require hospices to regularly assess patient conditions.
>
> "By improperly admitting and improperly retaining, the corrupt hospice company increases its patient census, which, of course, means more money to the hospice company," Schlein said. "The more patients you have on hospice, the more that the government pays you."

Robert Holly, *OIG Puts Pressure On as Hospice Fraud Case Pile Up*, Home Health Care News (June 24, 2018), available at: https://homehealthcarenews.com/2018/06/oig-puts-the-pressure-on-as-hospice-fraud-cases-pile-up/.

13.     Two specific federal statutes exist to combat these problems. The Anti-Kickback Statute prohibits hospice providers from offering or paying anything of value to induce referrals of patients receiving Medicare-covered services. 42 U.S.C. § 1320a-7b(b)(2)(A). And the False Claims Act makes it unlawful for any person or entity to knowingly present or cause to be presented a false or fraudulent claim to the government for payment or approval. 31 U.S.C. § 3729(a)(1). These statutes are "designed to prevent or ameliorate fraud, waste and abuse" in the federal health care system. 42 C.F.R. § 422.504(h).

**I.      Catholic Community Hospice's Violations of the Anti-Kickback Statute**

14.     During her employment with Catholic Charities, Plaintiff discovered and reported numerous forms of enticements used by Catholic Community Hospice to induce referrals of Medicare-eligible patients from skilled nursing facilities in violation of the Anti-Kickback Statute.

15.     In one example of an illegal kickback scheme, Catholic Community Hospice used its "Angel Vigil" program to pay for outside agency staff who provided patient services for skilled nursing facilities. The personnel paid by Catholic Community Hospice worked as de facto staff for

those skilled nursing facilities and performed patient caregiving services that would normally be the responsibility of those facilities (and for which the facilities were already compensated through the Medicare program). This provided significant financial benefit to the skill nursing facilities by allowing them to avoid the cost of staffing that work. In FY 2019, CCH paid approximately $85,000 for outside agency staff to provide services for skilled nursing facilities through the Angel Vigil program.

16. The Angel Vigil program was used as a marketing scheme to generate patient referrals in a quid pro quo with skilled nursing facilities that benefited financially from the arrangement. This is evident in many comments by Catholic Community Hospice staff about the Angel Vigil program. For example, when Plaintiff first raised concerns about the program, she was told that nursing facilities "expect us to cover these patients because they are understaffed." When Plaintiff expressed concerns to Community Catholic Hospice Business Office Manager Bridgette Gregory about the legality of the apparent quid pro quo, Ms. Gregory stated: "I know, I get it. But that's how we've been doing it for a long time now. Otherwise, we wouldn't get referrals." And when Plaintiff announced a plan to reform the program to eliminate use of paid outside personnel to perform caregiving services for the nursing facilities, marketers Joel Cushing and Pam Imber both strenuously objected that Catholic Community Hospice would "stop getting referrals" and "lose all of its business" if the Angel Vigil program was reformed.

17. Over strenuous objection from much of the staff and the marketers, the program was temporarily modified to stop the use of paid outside personnel in skilled nursing facilities. The best evidence of a quid pro quo is the result of the reformed program—when the Angel Vigil

program was changed to remove paid outside personnel from Villa St. Francis, that facility immediately stopped referring its residents to Catholic Community Hospice.

18. After Plaintiff was terminated, Catholic Community Hospice resumed its use of the Angel Vigil program to provide paid outside personnel to skilled nursing facilities. This was a direct response to Catholic Community Hospice's reduced patient census and is a clear attempt to once again induce patient referrals from skilled nursing facilities though an illegal quid pro quo that violates the Anti-Kickback Statute.

19. In addition to paid outside personnel supplied to skilled nursing facilities through the Angel Vigil program, Catholic Community Hospice also provided a full-time Registered Nurse and full-time Licensed Practical Nurse to work at Villa St. Francis. These two individuals were paid by Catholic Community Hospice but performed work for Villa St. Francis that otherwise would have been performed by that facility's own staff, including medication administration, feeding assistance and nursing services covered under the Medicare/Medicaid room-and-board payment made to Villa St. Francis. This arrangement was so engrained that the nurses were given their own office at Villa St. Francis' facility.

20. In another indication of an illegal quid pro quo, Villa St. Francis stopped referring patients to Catholic Community Hospice when these nurses were no longer embedded at the Villa St. Francis facility.

21. The HHS OIG has taken the position that prohibited kickbacks include "[a] hospice providing staff at its own expense to the nursing home to perform duties that otherwise would be performed by the nursing home." HHS OIG, *Fraud and Abuse in Nursing Home Arrangements with Hospices*, *supra*, at 4. Catholic Community Hospice's use of the Angel Vigil program to provide

paid outside staff to perform substitute caregiving services for patients at Villa St. Francis and other skilled nursing facilities is a clear violation of the Anti-Kickback Statute. Catholic Community Hospice's provision of paid nurses to provide patient services for Villa St. Francis is another clear violation of the Anti-Kickback Statute.

22.     In another example of an illegal kickback scheme, Catholic Community Hospice sought to induce patient referrals by supplying patient personal care items to skilled nursing facilities. In FY 2019, Catholic Community Hospice spent approximately $75,000 on briefs, wipes, ointments and similar personal care supplies provided to skilled nursing facilities for patient use. These personal care supplies are covered by the Medicare/Medicaid room-and-board payment made to the skilled nursing facilities and are required to be provided by the skilled nursing facilities. Providing these items at no cost to skilled nursing facilities is a violation of Community Catholic Hospice's Conditions of Participation in the federal Medicare program. 42 C.F.R. § 418.112(c)(4) (requiring written agreement for hospice services to specify that skilled nursing facility retains responsibility for personal care of patients).

23.     The HHS OIG recognizes this as another form of prohibited kickback. *See* HHS OIG, *Fraud and Abuse in Nursing Home Arrangements with Hospices*, *supra*, at 4 (noting that suspected kickbacks include "[a] hospice offering free goods . . . to induce a nursing home to refer patients to the hospice"). Catholic Community Hospice's provision of valuable personal care supplies to skilled nursing facilities as a quid pro quo to induce patient referrals is a clear violation of the Anti-Kickback Statute.

## II. Catholic Community Hospice's Violations of the False Claims Act

24. The Anti-Kickback Statute, as recently amended, expressly provides that an illegal kickback scheme is a per se violation of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g). Thus, all of the violations of the Anti-Kickback Statute outlined above also constitute violations of the False Claims Act.

25. In addition to illegal inducement of patient referrals from skilled nursing facilities, Catholic Charities and Catholic Community Hospice also have violated the False Claims Act by billing services for patients who were ineligible for hospice care.

26. Medicare's hospice benefit covers individuals certified as terminally ill, meaning persons having a medical prognosis with a life expectancy of six months or less if the illness runs its normal course. *See* 42 C.F.R. §§ 418.20(b), 418.22(b)(1). The initial certification of terminal illness covers the first 90-day period of hospice care; recertification of terminal illness is required for the second 90-day period of hospice care and for each subsequent 60-day period of hospice care. *Id.* §§ 418.21(a); 418.22(a)(1). Certification or recertification of a terminal illness is a prerequisite to submitting a claim for payment of hospice services. *Id.* § 418.22(a)(2).

27. For a hospice patient whose hospice care exceeds 180 days, a Catholic Community Hospice physician or nurse practitioner is required to have a face-to-face encounter with the patient every 60 days to "gather clinical findings to determine continued eligibility for hospice care." *Id.* § 418.22(a)(4). Each face-to-face encounter must be memorialized in a written attestation that includes the date of the visit and confirms that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care. *Id.* § 418.22(b)(4). The recertification of terminal illness must incorporate the face-to-face

encounter, providing clinical information to support a medical prognosis of terminal illness and a brief narrative explanation of the clinical findings. *Id.* § 418.22(b)(2)-(3). This cannot be a cookie-cutter exercise: "The narrative [used for certification or recertification] must reflect the patient's clinical circumstances and cannot contain check boxes or standard language used for all patients." *Id.* 418.22(b)(3)(iv).

28. When Plaintiff started with Catholic Community Hospice in May 2019, she discovered dozens of patients who had been receiving hospice care for more than one year, including some patients who had been receiving hospice care for more than two years and one patient who had been receiving hospice care for almost three years. After reviewing patient charts, it became evident to Plaintiff that many of these patients were not hospice eligible and had not been properly certified for hospice care. In particular, many of the patients had recertification notes that were simply copied verbatim from one recertification to the next, which is patently insufficient to meet the regulatory requirements for unique, individual clinical findings to support each recertification based on a face-to-face encounter assessing the patient's current condition and medical prognosis.

29. Plaintiff's review resulted in disqualification of approximately 20 patients from eligibility for hospice care—a clear indication that Catholic Charities and Catholic Community Hospice had been improperly billing for services provided to these patients.

### III. Plaintiff's Employment, Whistleblowing Activities, Unwarranted Discipline and Retaliatory Termination

30. As Clinical Director of Catholic Community Hospice, Plaintiff was responsible for accountability and oversight for all hospice staff in compliance with OSHA, CMS and individual discipline licenses and certifications in the delivery of end-of-life care for all patients and provider-

facing clients. Plaintiff's duties and responsibilities as Clinical Director did not include monitoring for, reporting or addressing apparent violations of the Anti-Kickback Statute and False Claims Act through illegal enticements for patient referrals. Plaintiff's conduct in reporting and responding to illegal enticements she discovered, as alleged herein, went beyond the normal and expected scope of her day-to-day job requirements.

31.     In May 2019, Plaintiff discovered and reported that dozens of patients appeared to have been improperly certified for hospice care and that billing hospice services for these patients violated the False Claims Act. Plaintiff immediately directed the review and decertification of ineligible hospice patients.

32.     At the same time, Plaintiff discovered and reported improper use of the Angel Vigil program to induce patient referrals from skilled nursing facilities. She specifically warned that offering enticements through the Angel Vigil program violated both the Anti-Kickback Statute and the False Claims Act, and she quickly began efforts to reform the program over intense opposition from several other Catholic Community Hospice employees.

33.     Plaintiff also took steps in early June 2019 to stop the practice of providing nurses paid by Catholic Community Hospice to Villa St. Francis, which she specifically identified and reported as another violation of the Anti-Kickback Statute and False Claims Act.

34.     When Plaintiff reported these concerns to her direct supervisor, former Executive Director Vince Teglia, he undermined and obstructed Plaintiff's efforts to identify and stop these violations of the Anti-Kickback Statute and False Claims Act. Teglia denied that violations had occurred, refused to address abusive conduct Plaintiff began receiving from other Catholic Community Hospice personnel when she attempted to correct the violations, and affirmatively

interfered with Plaintiff's efforts to reform the Angel Vigil program by instructing staff that they were still "free to manage their cases as they see fit"—meaning they were free to continue violating federal healthcare law by using the Angel Vigil program to provide skilled nursing facilities with around-the-clock staff paid for by Catholic Community Hospice as an inducement for patient referrals.

35. When her reports to Teglia proved unproductive, Plaintiff reported her concerns regarding the legal violations outside her normal chain of command to Catholic Charities Chief Executive Officer Lauren Solidum and Catholic Charities Chief Operating Officer Kevin Bentley. She made clear in these reports that Catholic Community Hospice was committing apparent violations of both the Anti-Kickback Statute and False Claims Act by billing hospice services for ineligible patients and using valuable enticements to induce patient referrals from skilled nursing facilities.

36. In late May or early June 2019, Plaintiff met with Solidum, Bentley and Teglia to discuss her concerns about the violations of the Anti-Kickback Statute and False Claims Act. Plaintiff made clear in this meeting that she was not just performing her normal duties, but was reporting specific concerns about violations of the Anti-Kickback Statute and False Claims Act and was seeking to prevent violations of those statutes that could have devastating financial consequences for Catholic Charities and Catholic Community Hospice.

37. In this meeting and in other conversations with Solidum and Bentley on the subject, Plaintiff specifically warned that the violations of the Anti-Kickback Statute and False Claims Act could result in significant civil and/or criminal liability and disqualification of Catholic Community Hospice from participation in the federal Medicare/Medicaid system. For example, Plaintiff

advised Solidum and Bentley of the fact that marketers Joel Cushing and Pam Imber were working for VITAS Healthcare when that hospice provider was sued for violations of the False Claims Act that included illegal billing and improper marketing tactics, which resulted in a $75 million settlement with the United States. Plaintiff also advised Solidum and Bentley of similar legal action taken against Suncoast Hospice for alleged violations of the False Claims Act.

38.     After Plaintiff went around Teglia to report her concerns to Solidum and Bentley, she was subjected to a series of escalating and unwarranted adverse employment actions.

39.     In early June 2019, Plaintiff told Teglia that she was the target of abusive behavior by certain individuals who wanted the Angel Vigil program to remain unchanged, including marketers Joel Cushing and Pam Imber, case managers Andrea Clark and Krista Schmidt, and Chaplain Tracy MacClement. Teglia refused to address that situation and left Plaintiff completely unprotected in an increasingly hostile work environment that grew worse by the day. This failure to act was intended to isolate Plaintiff and discourage her from continuing her whistleblower activities.

40.     On July 3, 2019, just a matter of weeks after the meeting with Solidum, Bentley and Teglia, Plaintiff received a contrived write-up from Teglia based on purported events that did not occur, were taken out of context or were so vaguely and subjectively described that Plaintiff could not possibly defend herself against the accusations. The real purpose of the write up was to discourage Plaintiff from continuing her whistleblowing efforts.

41.     On its face, the write up draws a clear link to Plaintiff's activity in reporting and attempting to remedy the violations of the Anti-Kickback Statute and False Claims Act that she had discovered. The write up alleges that Plaintiff blamed, accused and called out marketers for

illegal conduct without concrete proof of wrongdoing—at that point, however, those marketers (Cushing and Imber) and others in the organization had already candidly admitted they did not want to change the Angel Vigil program because Catholic Community Hospice would lose patient referrals from skilled nursing facilities. This is concrete proof of wrongdoing through inducements for patient referrals, and the write up demonstrates Teglia's effort to whitewash that proof and turn his criticism toward the Plaintiff as the whistleblower instead.

42. The write up also accuses Plaintiff of becoming "visibly frustrated and losing composure" in staff meetings regarding the Angel Vigil program. Again, this shows a clear link between the disciplinary action Plaintiff received and her activity in attempting to stop the illegal kickback scheme in an increasingly hostile work environment. It also reflects a sexist view of office dynamics that punishes Plaintiff for having courage to speak her mind and stand her ground in reporting and opposing her colleagues' illegal conduct.

43. The write up also was issued without any prior coaching or verbal warning as required by Catholic Charities' progressive discipline policy and normal practices.

44. On September 25, 2019, HR Manager Jamie Stevens informed Plaintiff that she was suspended indefinitely for unspecified "concerns" received from other employees. The suspension came as a complete surprise to Plaintiff because just days earlier she had met with Teglia, who mentioned he had received "some concerns of the staff" but said "it's nothing bad so we'll talk about it later."

45. Plaintiff never received written notification of her suspension or an explanation of the reason for the suspension. The suspension was unwarranted and followed a continued pattern of antagonism and retaliation against Plaintiff for reporting the use of illegal enticements in the

Angel Vigil program. Many staff members resisted efforts to reform the Angel Vigil program, and at the time of her suspension, Plaintiff was in the process of preparing and administering a write up to an employee who refused to use the Angel Vigil program in a manner that did not violate federal healthcare laws. Teglia and Stevens knew of the forthcoming write up and suspended Plaintiff before the disciplinary action could be completed.

46. During an "investigative" interview following Plaintiff's suspension, Stevens noted that the "concerns" regarding Plaintiff centered around her reports of illegal enticements and her efforts to reform the Angel Vigil program, which were described as "intimidating" and reflective of a "lack of concern" for Catholic Community Hospice patients. Again, this indicates a clear link between the disciplinary action Plaintiff received and her protected activity in reporting and attempting to take action on the use of the Angel Vigil program as an illegal kickback scheme that violated the Anti-Kickback Statute and False Claims Act.

47. Plaintiff was terminated on October 10, 2019 while still on suspension. She was never notified of the results of the HR "investigation" or provided any explanation of the evidence against her or the reason for her termination. Catholic Charities was being advised by counsel during the investigation but refused to allow Plaintiff to be represented by her own attorney during her interview. The entire process smacks of a railroading designed to remove Plaintiff before her efforts to reform the Angel Vigil program could cause any further loss of referrals, reduction of the patient census, or other financial setbacks to the organization.

48. During the "investigative" interview while she was suspended, Plaintiff told Stevens that she felt like she was being targeted for reporting that the Angel Vigil program was being used as an illegal inducement for patient referrals in violation of federal healthcare law. In

response, Stevens told Plaintiff: "Well that's how we've always run the program. If you remember, I told you to 'go slow' in making changes and so did Kevin." These comments clearly indicate that Plaintiff was ostracized, disciplined and eventually terminated as a retaliatory measure because she acted too quickly and drastically in attempting to bring the Angel Vigil program and other Catholic Community Hospice practices into compliance with the Anti-Kickback Statute and False Claims Act.

## Count I
## Retaliation under the False Claims Act, 31 U.S.C. § 3730(h)

49. Plaintiff incorporates by reference all paragraphs and allegations in this Complaint as though fully set forth herein.

50. As alleged above, Plaintiff engaged in protected activity by reporting and lawfully trying to stop one or more violations of the False Claim Act, including (i) Catholic Community Hospice's use of the Angel Vigil program to provide paid outside staff to perform caregiving services for skilled nursing facilities as an inducement for patient referrals, which violated both the Anti-Kickback Statute and the False Claims Act; (ii) Catholic Community Hospice's provision of paid nurses to provide patient services for Villa St. Francis as an inducement for patient referrals, which violated both the Anti-Kickback Statute and the False Claims Act; (iii) Catholic Community Hospice's provision of valuable personal care supplies to skilled nursing facilities as an inducement for patient referrals, which violated both the Anti-Kickback Statute and the False Claims Act; and (iv) unlawful billing by Catholic Charities and Catholic Community Hospice for patients who were not properly certified as hospice-eligible under Medicare regulations, which violated the False Claims Act.

51. Whether or not any actual False Claims Act violation occurred, Plaintiff reasonably and in good faith believed that the conduct described above constituted illegal enticements and unlawful billing practices in violation of the False Claims Act. She reported and responded to the apparent violations accordingly, including by going outside her normal chain of command to make specific warnings of violations of the Anti-Kickback Statute and False Claims Act and substantial financial exposure to Catholic Charities associated with those violations.

52. As alleged above, Catholic Charities knew of Plaintiff's protected activity, including her continuous efforts to stop what appeared to be—and what she reasonably and in good faith believed to be—ongoing violations of the False Claims Act.

53. As alleged above, Catholic Charities retaliated against Plaintiff because of her protected activity in trying to stop ongoing violations of the False Claims Act by subjecting her to a hostile work environment and taking a series of escalating and unwarranted adverse employment actions against her, including a write up, suspension and eventual termination.

54. As a direct result of Catholic Charities' retaliatory conduct, Plaintiff has sustained damage, including without limitation lost pay and benefits and emotional distress.

## Prayer for Relief

WHEREFORE, Plaintiff Trudi Shouse respectfully requests that this Court enter judgment against Defendant Catholic Charities of Northeast Kansas, Inc. for actual and special damages including emotional distress, double back pay and benefits with interest, reinstatement or front pay and benefits, attorneys' fees and costs incurred, and for such other and further relief as the Court deems just and necessary.

## Demand for Jury Trial

Plaintiff hereby demands trial by jury on all claims and issues so triable.

                              Respectfully submitted,

                              SHANK & MOORE, LLC

                              By  */s/ Stephen J. Moore*
                                    Stephen J. Moore          MO #59080
                                    1968 Shawnee Mission Pkwy, Suite 100
                                    Mission Woods, Kansas 66205
                                    Telephone:   816.471.0909
                                    Facsimile:    816.471.3888
                                    sjm@shankmoore.com

                              *Attorneys for Plaintiff Trudi Shouse*